(10 Misc. Rep. 563.)

STEINWAY v. STEINWAY et al.

(Supreme Court, Special Term, New York County. December, 1894.)

WILLS—VALIDITY OF BEQUESTS—PERPETUITIES.

Testator bequeathed certain shares of corporate stock to his executors in trust, to be managed by them until January 1, 1894, for the benefit of certain persons, so as to pay the beneficiaries an annual sum amounting to 5 per cent. on such shares, and on January 1, 1894, to pay over the shares or the proceeds thereof to the persons named, the excess of the annual income of the shares over 5 per cent. to go to the trustees as their compensation. *Held*, that such provision violated the statute against perpetuities.

Action by Henry W. T. Steinway against William Steinway and others to construe the will of W. F. T. Steinway, deceased.

Edward B. Hill, for plaintiff.
G. W. Cotterill, for defendant executors.
Samuel F. Prentiss, guardian ad litem, for infant defendants.

INGRAHAM, J. The question to be determined in this case is whether the provision of the thirty-third clause of the will of W. F. T. Steinway, whereby 4,000 shares of the stock of the corporation of Steinway & Sons are disposed of, is valid; and it is with reluctance that I have been forced to the conclusion that the scheme of the tes-

tator cannot be sustained. The intention of the testator is clear, and I think it also clear that to carry that intention into effect would be to violate the one limitation which the law of this state imposes upon the disposition of personal property, and that is that the vesting of the absolute ownership of such property shall not be suspended for a longer period than two lives in being at the date of the instrument containing the limitation or condition. The will of the testator, after making a large number of legacies, provides, in the thirty-third clause, for the disposition of his stock in the corporation above named. That clause commences as follows:

"Thirty-Third. I give and bequeath all my shares in the corporation of Steinway & Sons, of the city of New York, to my executors and trustees, hereinafter named, in trust, to be managed by them until the first day of January, in the year one thousand nine hundred and four (January 1st, 1904), as follows: A—One-fourth part of such shares in the Steinway & Sons' corporation to and for the benefit of the five children of my sister, Wilhelmine Candidus, late of the city of New York, deceased, viz. Louise Deppermann, wife of Gustave Deppermann, of Hamburg, Germany; Albertine S. Ziegler, wife of Henry Ziegler, of New York; and Harry Candidus, Johanne Candidus, and Gustave Candidus, and to pay to them, in equal proportions, an annual sum representing an income of five per centum on and from such shares, and on the first day of January, 1904, to pay over, in equal proportions, to the said five children of Wilhelmine Candidus, deceased, or their heirs, the said shares in the Steinway & Sons' corporation, or the proceeds thereof; to have and to hold to him, her, or them, his, her, or their heirs and assigns, forever. The excess of the annual income of such shares in the Steinway & Sons' corporation, New York, over and above said five per centum, shall be retained by my executors and trustees, hereinafter named, as their compensation for the management of such shares, and such excess, annually, shall be divided pro rata among them or their successors until January 1, 1904."

Subdivisions B and C of said clause make provision in identically the same language; subdivision B disposing of one-fourth part of said shares to and for the benefit of the children of his sister Dorrette Ziegler, and subdivision C disposing of one-fourth part of said shares to and for the benefit of his brother Charles Steinway. Subdivision D of the said clause contains a provision disposing of one-fourth part of said stock for the benefit of his brother William Steinway. But the variation between subdivision D and the other subdivisions is important, as throwing light upon the intention of the testator. Subdivision D is as follows:

"One-fourth part of my shares in the said Steinway & Sons' corporation to and for the benefit of my brother William Steinway, or, in case of his death prior to January 1st, 1904, to and for his son George A. Steinway, his daughter Paula Th. Steinway, and his children by his second wife, Elizabeth C. Steinway, nee Ranft; and to pay to him, or, in case of his death, to his said children, an annual sum representing an income of five per centum in and from such shares, and on the first day of January, 1904, to pay over to my said brother William Steinway, or, in case of his death prior to that date, to his said children as mentioned in this section of this my last will and testament, or their heirs, in equal proportions, the said shares in the Steinway & Sons' corporation, or the proceeds thereof; to have and to hold to him, her, or them, his, her, or their heirs or assigns, forever."

And the clause then contains the same provision as to the excess of the annual income of such shares over and above the five per cent.

The thirty-sixth clause of the will is also important as showing just what the testator intended by the words "to be managed," contained in the first part of the thirty-third clause, as the trust upon which the shares were to be held. After appointing his executors and trustees, he gives them full power and authority—

"To transfer or cause to be transferred any of my shares of stock in the Steinway & Sons' corporation according to the terms of this, my last will and testament, and also to vote on any such shares in the stockholders' meetings of the Steinway & Sons' corporation, and in their discretion to assent to or oppose any reduction or increase of the captial stock of said Steinway & Sons' corporation; and also, in case of such reduction of the capital stock of the Steinway & Sons' corporation, or the discontinuance of the said corporation being determined upon by the lawful majority of the stockholders of the Steinway & Sons' corporation, to invest the proceeds of my said shares therein (which shall not be less than the par value thereof) in securities deemed good and sufficient by them, and to apply and manage principal and interest of such investment precisely as I have directed to be done with my said shares of stock in the Steinway & Sons' corporation."

Our first duty is to ascertain, if possible, just what the intention of the testator was in respect to these shares of stock. As was said by Chief Justice Church in Colton v. Fox, 67 N. Y. 348:

"The intention of the testator must be ascertained, and the will construed accordingly, if practicable, and, when the construction is determined,—that is, when it is ascertained what disposition the testator intended to make of his property,—the question then is whether such disposition is in accordance with the law of the state."

A careful consideration of these two clauses of the will that I have named can leave no doubt as to what the testator intended. The intention is clearly expressed that his stock in the Steinway & Sons' corporation should be held by his executors; should stand in their name upon the books of the corporation; should be voted upon by them for the election of officers and the control of the business of the corporation, even so far as to reduce the stock or to dissolve the corporation, according to their discretion, until January 1, 1904. During that period neither of the persons who are ultimately to be entitled to have the stock transferred to them was to have the slightest voice in the management of the corporation, in the disposition of its business, the election of its officers, or in the continuance of the business of the corporation. No power of sale is given to the trustees to sell a share of this stock. If the business of the corporation was discontinued, and its assets divided among the stockholders, then the trustees were to receive the proceeds, and invest and hold the same so invested in lieu of the stock itself; but, unless the corporation was dissolved, and its business terminated, the trustees could not sell the stock in any way that would transfer the title from themselves, nor could either of the persons who were ultimately entitled to receive the stock during this period sell it, nor would it be liable to be applied to the payment of debts, or disposed of in any one of the numerous ways that a person can dispose of his personal property. Thus, in subdivisions A, B, and C, the executors or trustees were "to pay over in equal proportions to the said five children of Wilhelmine,

deceased, or their heirs, the said shares in the Steinway & Sons' corporation." This, standing alone, would clearly show that the testator intended that in case of the death of either of the five children prior to January 1, 1904, the heirs were to stand in the place of the person dying, and were to receive the share that would be coming to him. The right to receive this portion of the stock was, therefore, contingent upon either of the persons named being alive on the 1st day of January, 1904. But if there were any doubt from this provision as it stood, subdivision D makes it clear, for there the one-fourth of the shares was to be given to testator's brother William Steinway; but, if he died prior to January 1, 1904, they were to be given to certain designated children, their heirs or assigns. Thus, during Mr. William Steinway's life, he could not assign or transfer his interest in these shares, but his right to receive the shares was contingent upon his living until January 1, 1904. If he should die before that time, then the right to receive the shares would vest absolutely in the children named. And to emphasize this intention, the testator, by the thirty-fifth clause of the will, after providing for the death of any one of the legatees named in the will, said:

"This, however, shall not affect in any way the distribution of my shares in the Steinway & Sons' corporation of New York, as provided for in the thirty-third section of this my last will and testament."

Thus this stock, representing a value of over $1,000,000, was placed in such a position that it could not be sold or disposed of in any way for a period not limited upon lives in being, but fixed at about 20 years from the date of the will, and nearly 15 years from the death of the testator. During that period it was the clear intention of the testator that the stock should not be sold or disposed of in any way, but should remain in bulk, managed and voted upon by the trustees, who were also to receive the dividends upon it, responsible to no one for their actions, and who were really to exercise every power and do every act, except sell the stock, that the owner of it could do.

The provision as to the dividends of the stock is also peculiar, and emphasizes the intention of the testator. It was provided that the trustees should pay to the persons named in each subdivision of this clause, in equal proportions, an annual sum representing an income of 5 per centum on and from said shares. That was not made dependent upon the shares paying any dividends, nor upon the trustees receiving any income at all from it, but appears to have been an absolute condition imposed upon the trustees upon their accepting the trust. It apparently had no relation to the income that was received from the stock itself. And then, by a further clause, the executors and trustees are authorized to retain any excess of income derived from said stock over and above the 5 per centum as their compensation for the management of the stock; and the evidence is that the amounts retained by the executors under this clause have been in excess of three-fifths of the dividend, amounting, generally, to three-fourths of such dividend. The effect, therefore,

is to confer upon the trustees or executors, in addition to the other evidence of ownership, the right to receive and apply to their own use the dividends declared upon the stock.  Let us look for a moment at the nature of the property transferred to the trustees.  It was stock in an incorporated company.  The property that the owner of shares of stock has in such a company is somewhat different from that which the owner of other real or personal property has where the possession of the property is necessary to its beneficial use.  The owner of such shares of stock has a right to the dividends declared on the stock; the right to vote so as to have a voice in the management of the company and in the selection of its officers, and to determine generally when it is for the interest of the stockholders to dissolve the corporation; and, upon the dissolution of the corporation, the right to receive his proportion of the property of the corporation after payment of its debts.  I can think of no other right or power, except the right to sell, that the owner of shares of stock has, nor any other act that need indicate absolute ownership. And, with the right to sell the stock, these rights comprise the sole and beneficial use that the owner of capital stock of a corporation has by virtue of his ownership.  Now, during this period of nearly 15 years, from the death of the testator down to the 1st day of January, 1904, every one of these acts of ownership or right to the beneficial enjoyment of the stock, except the right to sell, was conferred upon the trustees; and the right to sell was given neither to the trustees nor to the persons who were to own the stock on the 1st day of January, 1904.  And, in the event that the corporation should be dissolved, then the testator provided that the amount paid as the distributive share of this particular stock should still be held by the trustees until January 1, 1904, and should be invested by them and retained upon the same conditions that the stock itself was to be retained.  Thus, upon no possible contingency, could any of these beneficiaries receive any interest in this stock, except a payment of a sum of money equal to 5 per cent. of its par value, until January 1, 1904.  But for this suspension of the ownership, I think it clear that this would constitute a valid trust of personal property.  The laws of this state have placed no restriction upon the owner of personal property creating a trust for any purpose that he desires.  There is but one limitation on the power of a person to deal with personal property, and that is contained in the following section of the Revised Statutes:

"The absolute ownership of personal property shall not be suspended by any limitation or condition whatever for a longer period than during the continuance and until the termination of not more than two lives in being at the date of the instrument containing such limitation or condition, or if such instrument be a will, for not more than two lives in being at the death of the testator." 1 Rev. St. p. 773, § 1.

And the question here is, whether this provision suspends the absolute ownership of this stock for a period greater than that of two lives in being.  The testator died on the 26th day of March, 1889.  The stock was to be delivered to the persons named on Jan-

uary 1, 1904. The period was thus not to be determined by lives in being at the time of the death of the testator, but was for a fixed period of nearly 15 years. If this were valid for 15 years, it would be equally valid for 1,500 years, which would be practically perpetual. Is there any possible reason why it would be void if fixed to end in 2004, and not void ending in 1904? Clearly not. And the only question, therefore, is whether the absolute ownership of this stock has been by this scheme suspended until 1904. What does the statute mean when it speaks of the absolute ownership of personal property? Does it mean an abstract right to have it at a future time, but which in the meanwhile excludes every act that the owner of like property can exercise over the property? Would it mean, in case of a horse, that a person was to call himself the owner, but should have no right to use the horse in any way, either to sell it, make a contract in regard to it, make any disposition of it at all, or have possession of it? I think no one would call himself the absolute owner of the horse under such circumstances; and can a person be said to be absolute owner of shares of stock which do not stand in his name upon the books of the company, on which he cannot vote, on which he can receive no dividends, which he cannot sell, and upon which, if the corporation be dissolved, he is not entitled to receive the share of the corporate property belonging to the stock? It seems to me that the statement of the proposition answers it. Just what was meant by the words "absolute ownership" was before the general term of the supreme court in the case of Converse v. Kellogg, 7 Barb. 596, and the judge (Allen) there discussed what is meant by absolute ownership with great ability and clearness, and, I think, with convincing force. The question that was presented to the court is stated by him as follows:

"If absolute ownership means nothing more than a vesting of the property, with a right of alienation, without the right of possession, then the restriction upon a division of the estate is not in conflict with the statute. But if the term used in the statute includes not only the property, but the right to actual, immediate, and unconditional possession, then the clause is repugnant to the statute, and is void. For beyond all question the condition contemplates the possession of the personal property by the executors in whom it vested, as incident to their office, until the time fixed for the distribution. Until that time there could be no ownership in severalty by the devisees of any part of the property. All would have an interest in every part, but no one would be entitled to any separate part to the exclusion of the others, and neither any nor all of the devisees would be entitled to the possession of the personal estate to the exclusion of the executors."

The question presented here could not be stated more clearly. After calling attention to the difference in the language of the statute in regard to real and personal property, the learned judge continues:

"Personal property is strictly and technically the subject of absolute ownership, while, in theory at least, real property is not, but is merely the subject of an estate. * * * The word 'absolute' was doubtless used as the opposite of 'conditional,' and in the same sense as 'perfect.' It signifies without any condition or incumbrance. To constitute a perfect title to real estate, there must be the union of actual possession, the right of possession, and the right of property. Can the title to personal property be said to be perfect, or the

ownership 'absolute,' while one person is the general owner and another has the possession and the right of possession? * * * The right of the executors to the possession, and the restraint upon division and actual possession, was an incumbrance upon the ownership of the devisees. 'Ownership' is the right by which a thing belongs to an individual to the exclusion of all other persons. In this case, if the condition in restraint of division is valid, there are two classes of owners, one general, the other special, neither having the absolute ownership."

And the court held:

"That the condition in the will that no division should be made until ten years after the death of the widow suspended the absolute ownership of the personal estate, and that said condition was, therefore, void."

Many cases have been cited on the briefs of counsel, and they have all been examined and studied, besides many cases not cited. I must confess that in some of the cases distinctions are.taken and arguments used which may be to some extent inconsistent with the views above expressed. These cases generally, however, apply to legacies of money left by will or legacies of a part or the whole of a residuary estate when the effect was simply to postpone payment of a legacy, but I have not been able to find one that distinctly applies to specific personal property of the character of the property in question. Of the many cases cited I think none more instructive than the case of Hillyer v. Vandewater, reported in the official reports in 121 N. Y. 681, 24 N. E. 999, where it is stated that the opinions are not published because a majority of the judges did not agree in any opinion. The opinions in full are printed in 24 N. E. 999. Three opinions appear to have been delivered,— one by Finch, J., who held that a trust was created, but that the absolute ownership of the property vested in the legatees immediately upon the death of the testator; an opinion by Gray, J., in which he concurred in the result of Judge Finch's opinion, upon the ground that no trust was created, and that the legatees took an estate subject to a power to be exercised by the executors; and one by Earl, J., in which he held that a trust was created, but that such trust violated the section of the Revised Statutes above cited. In the official reports it is stated that Finch and Gray, JJ., read for affirmance, and Ruger, C. J., and Andrews, J., concurred in result; but Earl, J., read for reversal, with whom Peckham and O'Brien, JJ., concurred. Apparently Judge Finch would have held the bequest void if no trust was created, and Judge Gray would have held the bequest void if a trust was created, and what Chief Judge Ruger and Judge Andrews would have done in either contingency does not appear. The position of Judge Earl and the two judges who agreed with him is not at all uncertain. In Judge Finch's opinion great stress is laid upon the fact that the ultimate vesting of the fee in the children did not depend upon their living at the end of the 10 years that the property was to remain undistributed, but upon the fact that the trust fund was severed instantly from the general estate of which it was the residue after payment of debts and specified legacies, and the interest and income of that severed residue, less the expense of obtain-

ing it, was to be divided into three equal portions as it accrued, and paid over to the beneficiaries; that upon the death of any one of the beneficiaries her share was vested in her heirs or next of kin; that the testatrix made no provision for that event, but left it to be governed by appropriate legal rules, and that the right to one-third of the income and one-third of the property itself which thus would have devolved upon the deceased child's heirs or next of kin would be a vested estate in such third, freed and discharged from the trust. If that was a proper construction of the will, it is clear that the statute was not violated, for immediately upon the death of one of the children the heirs at law or next of kin became entitled to the possession and absolute ownership of the property. The period thereof during which the ownership of each share was suspended was 10 years, unless sooner terminated by the death of one of the children. How different the facts of this case before us, where upon no contingency can there ever be any disposition of this property until 1904. If one of the persons named should die, the sum fixed to be paid to him as 5 per cent. upon the shares of stock which was ultimately to come to him or his heirs was to be paid to his heirs until the full period had expired, and in that case the personal representatives or assigns of the person so dying would have no interest in the shares of stock, but the trustees were bound to ascertain, on January 1, 1904, who were then the heirs of the one dying, and transfer the stock to such heirs. The opinion of Judge Earl, stating his construction of the will, which differs materially from that of Judge Finch, says:

"If, during the term, one of the daughters should convey her share in the remainder, the purchaser would take it subject to the trust; and, if either of them should die during the term, her representatives would take her remainder subject to the trust, and the duty of the trustees, who during the term are joint tenants, to divide the estate at the end of the ten years between the persons then entitled to the same, would still remain. There was, therefore, an attempt to create a trust term for ten years, during which time, if the trust is valid, the corpus of the estate is tied up in the hands of the trustees, and rendered inalienable, and its absolute ownership suspended. That such a disposition of the property violates the statute against perpetuities cannot be doubted."

It seems to me that I can leave this case without further argument, and without the citation of further authorities, upon this quotation from Judge Earl's opinion, for the result of this clause in the will certainly is to create a trust for over 15 years, during which time, if the trust is valid, the corpus of the estate is tied up in the hands of the trustees, and is rendered inalienable, and its absolute ownership suspended. That such a trust estate is created is clear. Look again for a moment at a provision of the clause in question. The testator gives and bequeaths his shares of stock to the executors and trustees, in trust "to be managed by them until the first day of January in the year one thousand nine hundred and four, as follows": One-fourth of such shares in the Steinway Company "to and for the benefit of the five children," etc. The title is here in express terms given to the trustees to manage the personal property

to and for the benefit of the beneficiaries, and what he meant by management of the property is expressed in the thirty-sixth clause of the will. It is to vote on the shares of the stock, and, in their discretion, to assent to or oppose any reduction or increase of the capital stock, and also, in case of such reduction thereof, or the discontinuance of the corporation being determined upon, to invest the proceeds of his shares in securities deemed good and sufficient by them, and to apply and manage principal and interest of such investments precisely as it was directed to be done with the shares of stock; thus, as above stated, giving to the trustees the power to do every act that the owner of that property could do, except to sell it; and no act happening prior to the year 1904 could terminate the trust. The death of all the persons named within that period would not terminate it, nor would any interest in the stock pass to either their assigns or their personal representatives, but the trustees would be bound to deliver the stock to such persons as should be ascertained to be the heirs of the beneficiaries named, except in the case of Mr. William Steinway, when the stock was to be delivered to certain of his children.

It would be useless for me to discuss any of the other cases cited by counsel. As before stated, they have all been examined, and I do not find anything decided in any of them that is controlling upon this question. I think, therefore, that a trust was created by this clause of the will, and that that trust is void, because it suspends the absolute ownership of the property for a period not measured by that of two lives in being at the death of the testator.

The point is taken that this court has no jurisdiction of this action, but that the same should be left to the surrogate's court. I think that question is settled in the case of Wager v. Wager, 89 N. Y. 161; and, while the court might refuse to take jurisdiction, and send the case to the surrogate's court, in a case of this importance I think the court should decide the question.

The defendant also claims that the plaintiff is estopped from insisting upon this clause being void, first, because he has accepted and received legacies under the will, and agreed to an increase of the capital stock of the corporation Steinway & Sons of $500,000. These acts undoubtedly would estop him from questioning the validity of the increase or the disposition that was made of the increased stock with his consent. It could not, however, operate to prevent his claiming that the whole trust was void. The receipt of other legacies under the will is not inconsistent with claiming that this trust is void; and, under the trust, the plaintiff had nothing to do with consenting to the increase of stock, as that was clearly vested in the trustees.

Nor do I think that the receipt, which also contains words of release, is conclusive. Under the form of the receipt the executors are only released by the plaintiff from any claim that he might have as heir at law, and not as residuary legatee. The paper, however, is merely a receipt, and is always open to explanations; and it is clear that neither the executors nor the plaintiff understood when plaintiff

signed that paper that it released a claim that this trust was void. It does not appear that the plaintiff received any consideration for such release, there then being paid to him only the amount that he was entitled to as one of the residuary legatees.  The plaintiff here does not claim under the trust, and at the same time seek to avoid the trust; he claims that the trust is void, and that the property passes to him as residuary legatee under the will; and I can see no act of his that estops him from asserting such a claim.

The point that the trust is void because the trustees are also the cestuis que trustent is answered by the very case cited to sustain the proposition (Woodward v. James, 115 N. Y. 346, 347, 22 N. E. 150), where Judge Finch, who delivered the opinion of the court, says:

"Where, however, the trustee is made beneficiary of the same estate, both in respect to its quality and quantity, the inevitable result is that the equitable is merged in the legal estate, and the latter alone remains." That "as to her half of the income, the widow was not trustee, and took what was given to her by a direct legal right, it does not follow that her trust estate in the corpus of the property is in any manner destroyed, or that there is any the less a necessity for its existence. She can be trustee for the heirs, and that trust ranges over the whole estate for the purpose of its management and disposition."

I shall not further discuss the questions presented, although of great interest, as I think this opinion is now too long.  It represents but a small portion of the time that I have spent upon this case, but upon the whole case I am clearly of the opinion that the plaintiff is entitled to the judgment asked for, and judgment is directed accordingly.

Judgment ordered for plaintiff in accordance with the foregoing opinion.